UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARY SIEBERT,

    Plaintiff,

  v.

GENE SECURITY NETWORK, INC,

    Defendant.

Case No. 11-cv-01987-JST

**ORDER GRANTING IN PART, DENYING IN PART MOTION TO DISMISS COUNTERCLAIMS FOR FAILURE TO STATE A CLAIM AND DENYING MOTION TO DISMISS FOR LACK OF JURISDICTION**

Re: ECF Nos. 54, 55

    Before the Court are Plaintiff-relator's Motions to Dismiss Defendant's Counterclaims. ECF Nos. 54, 55. The Court will grant in part and deny in part the motion to dismiss for failure to state a claim, and deny the motion for lack of subject matter jurisdiction.

I. **BACKGROUND**

    Plaintiff-relator and Defendant-in-counterclaim Gary Siebert filed this *qui tam* action against Defendant Gene Security Network, Inc., now known as Natera, Inc.,[1] on April 22, 2011 for violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). ECF No. 1. The operative First Amended Complaint was filed March 21, 2013. ECF No. 22 ("FAC"). The Court previously denied Defendant's motion to dismiss the First Amended Complaint. ECF No. 41 (June 17, 2013). Defendant answered and counterclaimed on July 1, 2013. ECF No. 44. The operative Amended Answer was filed pursuant to stipulation on August 6, 2013. Am. Answer, ECF No. 50. Relator filed the instant motions to dismiss the counterclaims pursuant to Federal

---

[1] The Court previously noted that Defendant claims its name has changed. This Order will refer to Defendant as Natera, since that is the name Defendant uses in its Answer, its opposition to the instant motion, and at the hearing on the motion. However, the Court encourages the parties to discuss whether an amendment to the Complaint to reflect Defendant's true name going forward is appropriate.

1   Rules of Civil Procedure 12(b)(1) and 12(b)(6 ) on August 20, 2013.  12(b)(1) Mot., ECF No. 55;
2   12(b)(6) Mot., ECF No. 54.  The matter is fully briefed, and the Court held a hearing on October
3   10, 2013.

4   Natera is a privately-held, for-profit biotechnology corporation that studies and conducts
5   molecular diagnostic tests for in vitro fertilization.  FAC ¶ 15.  From 2007 to 2010, Natera applied
6   to receive three research grants from the National Institutes of Health ("NIH") and was awarded a
7   total of $3,494,750.  Id. ¶ 19–25.  Siebert alleges that the NIH grant awards were conditioned on
8   compliance with financial management system requirements, addressed in the NIH Grants Policy
9   Statement and the Uniform Administrative Requirements for Awards and Subawards to
10  Institutions of Higher Education, Hospitals, Other Nonprofit Organizations, and Commercial
11  Organizations, 45 C.F.R. 74 ("UAR").  Id. ¶ 18, 28.  The NIH Grants Policy Statement and UAR
12  are intended to ensure that the rate and type of expenditures are consistent with the approved
13  project.  Id. ¶ 17.

14  Siebert alleges that Natera's affirmative statements in its applications for NIH grants and
15  its consent to program requirements contained in NIH award letters were fraudulent because
16  Natera was not in compliance with the mandatory financial monitoring provisions for
17  organizations receiving NIH grants.  Id. ¶ 28–31.  Siebert alleges that at the time of each grant
18  award, Natera was aware of its failure to monitor its finances in accordance with NIH
19  requirements — in particular, its failure to track the time employees spent on specific projects and
20  failing to track expenditures by project.  Id. ¶ 28, 32.

21  Natera asserts six counterclaims against Siebert: breach of fiduciary duty, fraud in the
22  inducement, breach of a confidentiality agreement, breach of a separation agreement, violation of
23  the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and violation of the California Computer
24  Crimes Act, Cal. Pen. Code § 502.

25  Natera alleges that Siebert formerly served as Chief Operating Officer and Senior Vice
26  President of Research at Natera.  In connection with his employment as COO, Siebert signed a
27  "Proprietary Information and Inventions Agreement" in which he "expressly acknowledged that
28  the confidential business, technical and financial information of Natera constituted 'Proprietary

Information' that he was obligated to hold in confidence, and not use or disclose for any purpose outside of the scope of his employment." Counterclaim ¶ 12. According to Natera, Siebert was responsible for the "development and administration of Natera's accounting and recordkeeping policies and procedures," and was aware of Natera's accounting and recordkeeping policies and procedures, including as they pertain to grant applications. Counterclaim ¶¶ 11, 13–15. Natera also alleges that Siebert was aware of the certifications Natera made on its grant applications that form the basis of the *qui tam* action. Counterclaim ¶ 16.

Natera alleges that Siebert also executed a separation agreement on March 27, 2011, pursuant to which Natera agreed to pay Siebert "valuable consideration including, without limitation, separation pay and an unearned partial milestone payment." Counterclaim ¶ 19. As part of that separation agreement, Natera alleges: "Siebert represented in the Separation Agreement that he had returned to Natera all property that belongs to Natera, including documents and computer files belonging to the Company, and further agreed to abide and be bound by the confidentiality obligations set forth in the [confidentiality agreement]." Counterclaim ¶ 20. The separation agreement included a release of "all claims and causes of action of any kind that he might have against Natera." Counterclaim ¶ 21.

Natera alleges that Siebert failed to inform the Board of Directors "that he understood that Natera had made false or fraudulent claims in violation of the False Claims Act." Counterclaim ¶ 22. Less than a month after executing the separation agreement, Siebert filed this action. Natera asserts Siebert fraudulently induced Natera's execution of the separation agreement.

In addition, Natera alleges Siebert breached his obligations under the confidentiality agreement by filing this action, in which he has filed publicly documents Natera argues are covered by the agreement.

Finally, Natera asserts claims for violation of federal computer crime laws, alleging that Siebert obtained confidential records from Natera by accessing Natera's computer system without authorization for purposes unrelated to the fulfillment of his duties as COO.

## II.  LEGAL STANDARDS

"A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the

3

challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).  In resolving a facial attack, courts assume that the allegations are true, and draw all reasonable inferences in the plaintiff's favor.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted).  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.  The court need not presume the truthfulness of the plaintiff's allegations.  Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Safe Air, 373 F.3d at 1039 (citations omitted).

On a Rule 12(b)(6) motion to dismiss, the Court accepts the material facts alleged by the non-moving party together with all reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the party asserting a claim must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 687.

In addition, fraud claims are subject to a heightened pleading standard.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The allegations must be specific enough to give a defendant notice of the particular misconduct alleged to constitute the fraud such that the defendant may defend against the charge. Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  In general, allegations sounding in fraud must contain "an account of the time, place, and specific content of the false

4

1    representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG

2    LLP, 476 F.3d 756, 765 (9th Cir. 2007).  However, "[m]alice, intent, knowledge, and other

3    conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

4    **III.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

5    Siebert moves to dismiss each counterclaim for lack of subject matter jurisdiction because

6    Natera's counterclaims have the purpose and effect of indemnifying or contributing to a *qui tam*

7    defendant's damages and therefore cannot be adjudicated until after Natera prevails in the

8    underlying action.  Siebert's argument is that the claims are not ripe, citing Allen v. Wright, 468

9    U.S. 737 (1984).

10   While Allen does stand for the general principle that ripeness is a requirement of Article III

11   jurisdiction, its facts bear no resemblance to the ones in this case.  Allen involved a challenge by

12   parents of African-American public school children to the Internal Revenue Service's alleged

13   failure to adopt standards and procedures to deny tax-exempt status to racially discriminatory

14   private schools.  468 U.S. at 739–40.  Thus, Allen is not helpful on the question presented here:

15   whether counterclaims for contribution or indemnity are "ripe" for adjudication before the

16   underlying litigation is resolved.

17   Federal courts in this Circuit that have faced that question have concluded either that

18   indemnity and contribution claims are ripe, Hecht v. Summerlin Life & Health Ins. Co., 536 F.

19   Supp. 2d 1236, 1242 (D. Nev. 2008); NuCal Foods, Inc. v. Quality Egg LLC, 918 F. Supp. 2d

20   1037, 1042 (E.D. Cal. 2013); Miller v. Sec. Life of Denver Ins. Co., No. 11-cv-1175-PJH, 2011

21   WL 7762985, at *1 (N.D. Cal. Dec. 14, 2011), or that the contribution and indemnity claims are

22   properly brought but should be stayed pending resolution of the underlying claim on which the

23   those claims are based, St. Paul Fire & Marine Ins. Co. v. Nonprofits Untied, 91 F. App'x 537 (9th

24   Cir. 2004).  Thus, even if the counterclaims may properly be characterized as indemnity or

25   contribution claims, the Court concludes that Siebert's challenge on pure ripeness grounds must be

26   denied.

27   In his motion, Siebert conflates the question of whether contribution or indemnity claims

28   are *ever* proper under the FCA with the question of whether the counterclaims are ripe.  In

1  Mortgages, Inc. v. U.S. District Court for the District of Nevada, 934 F.2d 209 (9th Cir. 1991), the
2  Ninth Circuit first articulated the rule regarding state law counterclaims for contribution or
3  indemnification arising out of *qui tam* litigation.  The Ninth Circuit held that a right to
4  contribution or indemnification does not exist under the FCA because the act was "in no way
5  intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a
6  qui tam plaintiff with 'unclean hands.'" Id. at 213.  After determining that the right to
7  contribution or indemnification also does not exist under federal common law, the Ninth Circuit
8  concluded that "there can be no right to assert state law counterclaims that, if prevailed on, would
9  end in the same result" as contribution or indemnification for liability stemming from the
10 underlying *qui tam* action.  Id., at 214.

11  The Ninth Circuit revisited the issue in U.S. ex rel. Madden v. General Dynamics Corp., 4
12 F.3d 827 (9th Cir. 1993).  There, the district court had dismissed all of the *qui tam* defendant's
13 counterclaims against the relators, even though the defendant sought "independent damages"
14 rather than ones for contribution or indemnity.  Id. at 830.  The district court reasoned that
15 counterclaims for independent damages were impermissible under Mortgages because, like
16 counterclaims for contribution or indemnity, "they have the practical effect of providing a
17 defendant the opportunity to offset its liability by recovering damages from qui tam plaintiffs." Id.
18 The Ninth Circuit reversed, and distinguished counterclaims for contribution or indemnity that
19 "*only* have the effect of offsetting liability," from counterclaims for independent damages, which
20 "are not dependent on a qui tam defendant's liability."  Id. at 830–31 (emphasis in original).
21 The court reasoned that because a *qui tam* defendant's counterclaims will often be compulsory
22 under Rule 13 of the Federal Rules of Civil Procedure, the defendant would be required to bring
23 the counterclaims in the relator's suit or risk losing the ability to bring them in later proceedings,
24 rendering a blanket rule barring all counterclaims violative of procedural due process.  Id. at 831.
25 Thus, while counterclaims for contribution or indemnity are prohibited, counterclaims for
26 independent damages are not.  Id. at 830-31.

27  Here, Natera brings counterclaims pursuant to Rule 13 and not third-party claims pursuant
28 to Rule 14, because the FCA allows relators to proceed "as a party."  See Mortgages, 934 F.2d at

1    211 n.2 (citing 31 U.S.C. § 3730(c)(1)).  A counterclaim is compulsory rather than permissive if it

2    "arises out of the transaction or occurrence that is the subject matter of the opposing party's

3    claim."  Fed. R. Civ. P. 13(a)(1)(A).  As Natera's counterclaims arise out of the same set of facts

4    as Plaintiff's allegations, Natera's counterclaims are compulsory pursuant to Rule 13 and

5    accordingly, are the type of counterclaims that the Ninth Circuit addressed in Madden.

6         The fact that some counterclaims are prohibited as a matter of public policy to avoid

7    weakening the FCA, id. at 830, however, does not mean that the bar to those claims is

8    jurisdictional.  It is possible, for example, that the holding in Mortgages is based on conflict

9    preemption principles, as the Ninth Circuit "explicitly found that state law claims that would allow

10   FCA violators to reduce the financial burden of their fraud would frustrate the object and policy of

11   the Act: to punish past fraudulent conduct without allowing contribution even from joint

12   tortfeasors who participated in the fraud."  Thomas F. O'Neil III, Esq. et. al., The Buck Stops

13   Here: Preemption of Third-Party Claims by the False Claims Act, 12 J. Contemp. Health L. &

14   Pol'y 41, 53 (1995).

15        The Court therefore DENIES Siebert's motion to dismiss for want of subject matter

16   jurisdiction, and now turns to Siebert's motion to dismiss for failure to state a claim.

17   **IV.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

18        **A.    Breach of Fiduciary Duty**

19        Natera alleges that Siebert owed a duty of loyalty to Natera that encompassed a duty to

20   prevent, remedy, or report conduct that he believed to be a violation of the False Claims Act.

21   Counterclaim ¶¶ 27–28.  Natera alleges that Siebert breached his duty of loyalty by failing to

22   report the alleged violations of the False Claims Act.  Counterclaim ¶ 29.  Siebert moves to

23   dismiss under Mortgages and its progeny.

24        Generally speaking, a breach of fiduciary duty claim arising out of a Plaintiff-relator's

25   failure to disclose a False Claims Act violation that subsequently becomes the basis of a *qui tam*

26   claim is barred by the FCA.  See U.S. ex rel. Miller v. Bill Harbert Int'l Construction., Inc., 505 F.

27   Supp. 2d 20 (D.D.C. 2007).  In Miller, the *qui tam* defendant asserted counterclaims against the

28   relator for breach of fiduciary duty as well as counterclaims seeking contribution and indemnity.

Id. at 24–25. The defendant alleged that the relator was aware of evidence of the bid rigging conspiracy that was at issue in the underlying false claims action, and suggested that the relator had a role in either perpetrating or concealing the fraud. Id. at 25. The *qui tam* defendant asserted that the relator violated a fiduciary duty by failing to report the fraud. Id. The court found the counterclaim was barred by the FCA.

After acknowledging that counterclaims seeking contribution or indemnity were barred, the Miller court proceeded to analyze whether the fiduciary duty claim was an "independent" claim that the qui tam defendant could bring against the relator. Id. at 26–27. After surveying the caselaw relating to counterclaims against FCA relators, including the Ninth Circuit's decisions in Mortgages and Madden, the Miller court found that there were two ways in which *qui tam* defendants could bring "independent" counterclaims. Id. at 27. The first is "where the conduct at issue is distinct from the conduct underlying the FCA case." Id. "This can be so even where there is a close nexus between the facts, so long as there is a clear distinction between the facts supporting liability against relator and the facts supporting liability against the FCA defendant." Id.

Second, and more relevant to the instant case, a counterclaim may be permissible "where the defendant's claim, though bound up in the facts of the FCA case, can only prevail if the defendant is found *not* liable in the FCA case." Id. (emphasis in original). The justification for permitting such counterclaims is that "[o]nce the question of FCA liability has been determined in the defendant's favor, there is less of the risk, envisioned by Mortgages and other cases, of deterring would-be relators, and no risk that a wrongdoer will be allowed to shift its costs." Id. at 28 ("The use of the word 'independent' has led to some confusion, and courts would be better served to describe the permissible claims as 'not dependent on the fact of FCA liability.'"). "The FCA defendant thus has a cause of action for damage to him independent of his FCA liability. These claims have surfaced in the form of libel, defamation, malicious prosecution, and abuse of process — claims that succeed upon a finding that the relator's accusations were untrue." Id.

The Miller court identified the types of counterclaims that fall outside those two categories, and are barred by the FCA, as follows:

8

> If a defendant's counterclaim is predicated on its own liability, then its claims against a relator typically will allege that the relator participated in the fraud, or caused the defendant some damage by the act of being a relator, that is, by disclosing the defendant's fraud. The first kind of action seeks contribution or indemnity, rights that are not provided by the FCA because they would deter relators, allow wrongdoers to shift their costs, and would disrupt the intended framework of incentives and punishments established by the FCA. The second kind of action has the same effect of providing contribution or indemnity, with the perverse twist that the relator is not even accused of contributing to the defendant's fraud. If such suits were allowed, they would punish innocent relators, which would be a significant deterrent to whistleblowing and would imperil the government's ability to detect, punish, and deter fraud. The FCA contains several provisions seeking to protect relators from retaliation, and it would run counter to this policy if the Court were to allow retaliatory suits against truthful relators.

Id. at 28–29.

Similarly, the *qui tam* defendant in U.S. ex rel. Vainer v. DaVita, Inc., No. 07-cv-2509-CAP, 2013 WL 1342431, at *5 (N.D. Ga. Feb. 13, 2013), asserted breach of contract counterclaims against the relator based on the relator's failure to notify the defendant of the FCA violations. The court found the counterclaims were barred despite being "couched in contract terms" because, to prove breach of contract, the defendant would have had to prove it violated the FCA. "If these violations occurred, then the defendants would be liable for them. Therefore, an element of the defendants' cause of action (i.e., breach) is dependent on the defendants' liability in the underlying action." Id.

Here, Natera's first counterclaim is "couched" in terms of breach of fiduciary duty, as it was in Miller, but it is, in essence, dependent on the fact of Natera's liability. To establish its claim, Natera must plead (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. Stanley v. Richmond, 35 Cal. App. 4th 1070, 1086 (Cal. Ct. App. 1995). Natera alleges that Siebert had a duty of loyalty to Natera that includes "a duty to prevent, remedy, or report conduct that he believed to constitute a violation of law," which duty Siebert allegedly breached when he failed to report purported violations of the FCA to Natera. Counterclaim ¶ 28. "In essence, it is a claim that the relator should have become a relator sooner, or that he should have informed the defendant before informing the government." Miller,

505 F. Supp. 2d at 29. Natera will prevail on its fiduciary duty claim only if Natera is found liable for violations of the FCA. Therefore, Natera's counterclaim is not an "independent" claim under Madden because Natera's ability to prevail on this claim invariably depends on it being found liable in the underlying FCA action.

Moreover, allowing Natera's counterclaim would directly conflict with the goals of the FCA. As the Miller court stated: "It [] would create the perverse result of making a truthful relator pay to offset the liability of a wrongdoing FCA defendant. This would be the equivalent of contribution or indemnification, and is not allowed." Id. Consequently, Natera's counterclaim for breach of fiduciary duty is DISMISSED with prejudice.

### B. Fraud in the Inducement, Breach of the Separation Agreement, and Breach of the Confidentiality Agreement

Natera asserts three counterclaims related to two contracts: fraud in the inducement of the separation agreement, breach of the separation agreement, and breach of the confidentiality agreement. The Court addresses the three claims together.

Natera alleges that Siebert fraudulently induced Natera into the making of the separation agreement, which agreement Siebert allegedly breached. As part of the inducement, Natera alleges that Siebert, intending to bring this FCA action, falsely represented (1) that he had returned and not retained any of Natera's documents or files, (2) that he would continue to be bound by the confidentiality agreement, (3) that he would not disparage Natera, and (4) that he would release all claims against Natera. Counterclaim ¶¶ 38–41. Natera alleges that it relied on those promises in deciding to provide consideration for the separation agreement, including forgiveness of a $20,000 loan for moving expenses.

In addition, Natera alleges Siebert breached the confidentiality agreement by retaining confidential documents and information after the termination of his employment, and by disclosing the documents or information by filing this action.

Fraud in the inducement is a subset of fraud that occurs when "the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present[,] and a contract is formed, which, by reason of the fraud, is voidable." Rosenthal v. Great Western Fin. Securities

10

1    Group, 14 Cal. 4th 394, 415 (1996) (quotation and emphasis omitted).  The elements of intentional

2    fraud are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) scienter

3    or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting

4    damage.  Lazar v. Super. Ct., 12 Cal. 4th 631, 638 (1996).  Additionally, fraud claims are subject

5    to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.

6         In addition, to prevail on its breach of contract claims, Natera must establish (1) the

7    existence of the contracts, (2) performance by Natera, (3) breach, and (4) damages.  Reichert v.

8    General Ins. Co., 68 Cal. 2d 822 (Cal. 1968).

### 1.    Confidentiality Obligations

10        The fraud in the inducement counterclaim and the breach of contract claims each allege

11   that Siebert unlawfully retained confidential documents and information and disclosed them by

12   filing this action.  Siebert argues that relators are exempt from such confidentiality obligations,

13   insofar as they would prevent a relator from alerting the government of fraud in connection with

14   the FCA, as a matter of public policy.

15        Nothing in the FCA addresses confidentiality agreements, nor the potential liability

16   relators may incur by virtue of their obligations of confidentiality to former employers.  However,

17   if a "substantial public interest would be impaired by enforcement of the agreement," the

18   agreement may be unenforceable.  U.S. ex rel. Green v. Northrop Corp., 59 F.3d 953 (9th Cir.

19   1995) (discussing Town of Newton v. Rumery, 480 U.S. 386, 392 (1987), and Davies v.

20   Grossmont Union High Sch. Dist., 930 F.2d 1390 (9th Cir. 1991), cert. denied, 501 U.S. 1252

21   (1991)).  The "Rumery/Davies" test led the Ninth Circuit to invalidate pre-filing releases of FCA

22   claims in Green.  The Green court found that pre-filing releases of FCA claims frustrate Congress'

23   "concern with maintaining adequate incentives for those who materially would advance the goals

24   of revealing fraud and supplementing government enforcement efforts."  Green, 59 F.3d at 964.

25        The Ninth Circuit subsequently evaluated a potential public policy exemption from

26   confidentiality agreements for FCA relators in Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys.,

27   Inc., 637 F.3d 1047, 1062 (9th Cir. 2011).  The Ninth Circuit observed that a public policy

28   exception to enforcement of confidentiality agreements "that would allow relators to disclose

confidential information in furtherance of an FCA action" has "some merit." Nevertheless, the Cafasso court declined to adopt such an exception in that case because the relator had engaged in "vast and indiscriminate appropriation" of her employer's files:

> Cafasso copied nearly eleven gigabytes of data — tens of thousands of pages. She decided which GDC4S documents to copy by browsing through folders related to technology and technology development, and, she testified, "if I saw something that I thought actually could apply and should be investigated, *I just grabbed the whole folder*" (emphasis added). Further, she scanned only file names and "did not look at any individual documents at all." Swept up in this unselective taking of documents were attorney-client privileged communications, trade secrets belonging to GDC4S and other contractors, internal research and development information, sensitive government information, and at least one patent application that the Patent Office had placed under a secrecy order. An exception broad enough to protect the scope of Cafasso's massive document gather in this case would make all confidentiality agreements unenforceable as long as the employee later files a qui tam action.

Cafasso, 637 F.3d at 1062. The Ninth Circuit concluded: "Were we to adopt a public policy exception to confidentiality agreements to protect relators — a matter we reserve for another day — those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim." Id.

Several courts, some relying on the Ninth Circuit's openness to the public policy exception Siebert proposes here, have adopted just such an exception. See, e.g., U.S. ex rel. Ruhe v. Masimo Corp., 929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012) (denying motion to strike exhibits because "[r]elators sought to expose a fraud against the government and limited their taking to documents relevant to the alleged fraud. Thus, this taking and publication was not wrongful, even in light of nondisclosure agreements, given 'the strong public policy in favor of protecting whistleblowers who report fraud against the government.'") (citing U.S. v. Cancer Treatment Ctrs. of Am., 350 F. Supp. 2d 765, 773 (N.D. Ill. 2004) (holding relator exempt from liability for breach of confidentiality agreement for disclosure to government of documents showing employer engaged in fraudulent healthcare billing)); U.S. ex rel. Head v. Kane Co., 668 F. Supp. 2d 146, 152 (D.D.C. 2009) ("Enforcing a private agreement that requires a qui tam plaintiff to turn over his or her copy

12

of a document, which is likely to be needed as evidence at trial, to the defendant who is under investigation would unduly frustrate the purpose" of the FCA.).

The Court agrees that any alleged obligation by Siebert not to retain or disclose the confidential documents that form the basis of this action is unenforceable as a matter of public policy because it would frustrate Congress' purpose in enacting the False Claims Act — namely, the public policy in favor of providing incentives for whistleblowers to come forward, file FCA suits, and aid the government in its investigation efforts. But the Court cannot now conclude that the counterclaim in its entirety should be dismissed, because it is possible that Siebert also took confidential documents that bore no relation[2] to his False Claims Act claim. See Cafasso, 637 F.3d at 1062 ("[C]ourts perhaps should consider in particular instances for particular documents whether confidentiality policies must give way to the needs of FCA litigation for the public's interest . . . ."). As to those documents, if there are any, Natera has adequately pleaded a counterclaim.

Siebert moves to dismiss on the additional ground that Natera failed adequately to allege which confidential documents or information Siebert wrongfully retained and disclosed. The Court is not familiar with any authority, and the parties cite none,[3] requiring Natera to identify each allegedly confidential document with particularity as a matter of pleading.[4] Again, the Court concludes that Natera has adequately pleaded a counterclaim.

It is possible that discovery will reveal that all of the confidential documents, if there are

---

[2] The Court uses the term "bears no relation" to describe the outer boundary of a potential claim. The Court reserves to another day the precise relationship a confidential document must have to a False Claims Act claim such that its removal cannot form the basis of liability.

[3] In support of his allegation that "Plaintiff is not able to respond to the substance of Defendant's claims because he has no way to know what confidential documents Defendant claims he removed," Siebert cites only Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), which do not address the issue.

[4] The only document identified by Natera thus far is Exhibit A to Siebert's declaration in support of his opposition to Natera's motion to dismiss this action. Exhibit A is a one-page e-mail in which a Natera employee states, in essence, that Natera "should not have any problem" with its audit. Half of the e-mail is a quotation from the NIH website; a large portion of it is redacted. The purportedly confidential nature of the document eludes the Court.

13

any, are adequately related to Siebert's FCA claims. It is also possible – perhaps even likely – that a stay or bifurcation of the counterclaims will be appropriate. For now, however, neither Natera's failure to identify specific documents, nor the fact that its claims for misappropriation of confidential documents arise in the context of an FCA suit, require dismissal of its counterclaims.

### 2. Release

Siebert also moves to dismiss Natera's counterclaims for fraud in the inducement of the separation agreement and breach of the separation agreement based on the Ninth Circuit's decision in Green, 59 F.3d at 953. In Green, the court held that pre-filing releases of FCA claims are unenforceable when they are entered into without the United States' knowledge or consent. Natera argues that Green is inapposite because Natera does not seek dismissal of the FCA action based on the release. Opp., ECF No. 59, p. 7. The Court disagrees. While Natera now characterizes its counterclaim as "a breach of the confidentiality provisions" of the Separation Agreement, the essence of its third counterclaim is that Siebert falsely represented in that Agreement that he would not bring claims against Natera. See, e.g., Am. Answer, ECF No. 50 at ¶ 58 ("Siebert falsely stated that he agreed to release all claims against Natera when, on information and belief, he intended to bring this Action against Natera.") Natera is effectively attempting to enforce that release.

Insofar as Natera's claims are based on a pre-filing general release that encompasses FCA claims, the release of the FCA claims is unenforceable under Green. 59 F.3d at 959 ("prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim."). Consequently, Natera cannot establish justifiable reliance or damages resulting from the alleged misrepresentation, nor can it establish the existence of the promise, breach, or damages with respect to its breach of contract claim.

Because Natera's counterclaims for fraud in the inducement and breach of the separation and confidentiality agreements survive, Siebert's motion to dismiss those claims is hereby GRANTED IN PART AND DENIED IN PART. Though the counterclaims are not dismissed, Natera shall amend its Counterclaim so as to excise any part of the fraud in the inducement and breach of contract counterclaims based on a pre-filing release.

### 3. Disparagement

Siebert moves to dismiss the breach of the separation agreement counterclaim with respect to disparagement as inadequately pled and barred by the FCA as dependent on the underlying FCA claim. The Court agrees that Natera's allegations concerning disparagement are bare and conclusory. The entirety of the disparagement claim contained in the breach of the separation agreement counterclaim is as follows:

> 55. In the Separation Agreement, Siebert further promised not to disparage, orally or in writing, Natera or its directors, officers, employees, products, services or business practices.
>
> 56. Siebert's breach of the PIIA, wrongful retention of Natera documents and files, and disparagement of Natera constitute a material breach of the Separation Agreement.

Counterclaim ¶¶ 55–56. It is unclear what statements or publications form the basis of the disparagement claim, or how the disparagement claim relates to the breach of contract claim. Natera does not address its disparagement claim in its opposition, nor does it identify a legal standard that underlies the claim. At the hearing, Natera again failed to identify a legal standard addressing disparagement as a breach of contractual obligations.

In California, disparagement could refer to trade libel or product disparagement. Atlantic Mutual Ins. Co. v. J. Lamb, Inc., 100 Cal. App. 4th 1017, 1035 (Cal. Ct. App. 2002) ("The term 'disparagement' has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy." ). To establish that claim, Natera must establish at a minimum, "(1) a publication; (2) which induces others not to deal with plaintiff; and (3) special damages." Nichols v. Great Am. Ins. Companies, 169 Cal. App. 3d 766, 773 (Cal. Ct. App. 1985). Natera's allegations contained in its breach of the separation agreement counterclaim fall far short of that standard.

However, it may also be that Natera intended to assert a defamation claim. If so, it is at least possible that Natera's breach of contract claim arising out of alleged disparagement does not depend on the fact of Natera's FCA liability, and is therefore permissible. See Miller, 505 F. Supp. 2d at 28 (discussing libel and defamation claims). But that claim is still inadequately pled, as Natera must allege, at a minimum, "intentional publication [or oral communication] of a

15

statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." Ringler Associates Inc. v. Maryland Cas. Co., 80 Cal. App. 4th 1165, 1179 (Cal. Ct. App. 2000). Having failed to allege which statements form the basis of the claim, the claim, if it is one for defamation, is inadequately pled.

Because Natera's counterclaim for breach of the separation agreement survives, as discussed above, Siebert's motion to dismiss that counterclaim is hereby GRANTED IN PART AND DENIED IN PART. Should Natera seek to proceed on its disparagement theory, it shall amend the disparagement allegations in compliance with the terms of this Order. Alternatively, Natera may strike those allegations from the Counterclaim.

### C.   Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, is "designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possessed the capacity to access and control high technology processes vital to our everyday lives." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1130 (9th Cir. 2009). The CFAA creates a civil right of action, in which the "plaintiff must prove that the defendant violated one of the provisions of [section] 1030(a) (1)-(7), and that the violation involved one of the factors listed in [section] 1030(a)(5)(B)." Id. at 1131.

Natera alleges that Siebert's conduct violated section 1030(a)(2)(C), which applies to any person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer," by accessing Natera's computer network to take or copy and make unauthorized use of data. Counterclaim ¶¶ 59–60.

Natera fails to state a CFAA claim because its allegations of Siebert's conduct go beyond the scope of the CFAA. The parties failed to point to any caselaw concerning the CFAA. However, the Court's decision is guided by the Ninth Circuit's decision in United States v. Nosal, 676 F.3d 854 (9th Cir. 2012). In Nosal, the defendant left his employment at an executive search firm to start a competing business, and shortly thereafter convinced several employees at the firm to join him. Id. at 856. Before leaving the firm, those employees used their log-in credentials to download confidential information from the firm's computer database and transferred that

16

information to the defendant. Id. While employees were authorized to access the database, the firm had a policy forbidding the disclosure of confidential information. Id. The government charged the defendant with violations of Section 1030(a)(4) of the CFAA "for aiding and abetting the [colleagues] in 'exceed[ing their] authorized access' with intent to defraud." Id. The government argued that the phrase "exceeds authorized access" in the CFAA could be interpreted to mean "someone who has unrestricted physical access to a computer, but is limited in the use to which he can put the information." Id. at 857.

The Ninth Circuit disagreed, holding that "exceeds authorized access" "does not extend to violations of use restrictions." Id. at 863. The Court argued that the government's interpretation of the phrase "would transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." Id. at 857. Accordingly, because the employees were authorized to access the confidential information, the court held that they did not exceed their authorized access of the firm's computer database, even though they violated the firm's policy of disclosing confidential information. Id. at 864.

Here, Natera alleges that Siebert was responsible for developing and supervising the company's "accounting and recordkeeping policies and procedures." Counterclaim ¶¶ 13–15. Natera does not allege that Siebert was not authorized to access Natera's computer network, or that Siebert was not employed by Natera at the time of the alleged conduct. Rather, it alleges that Siebert exceeded his authorized use when he "knowingly and without permission took or copied and made unauthorized use of data located on Natera's computer system." Id. ¶¶ 59–60. That claim is expressly precluded by Nosal, and is consequently DISMISSED with leave to amend.

**D.     California Comprehensive Computer Data Access and Fraud Act**

The California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, "expand[s] the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

Under the CDAFA, Natera must allege that it suffered damage or loss by reason of a violation of Section 502(c) of the California Penal Code. Natera does not specify which

subsection of Section 502(c) was violated by Plaintiff's alleged conduct.  As Natera does not allege that Plaintiff altered, deleted, damaged, or destroyed any data, computer system or computer network, Natera's counterclaim is limited to subsections 502(c)(2), (3), and (7).  See Facebook, Inc. v. Power Ventures, Inc., No. 08-cv-05780-JW, 2010 WL 3291750, at *6 (N.D. Cal. July 20, 2010) ("Power Ventures I").

Section 502(c)(2) holds liable any person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network."  Section 502(c)(3) holds liable any person who "[k]nowingly and without permission uses or causes to be used computer services."  Section 502(c)(7) holds liable any person who "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."  Cal. Penal Code § 502(c)(2), (3), (7).

Each of the subsections in question requires that the person act "without permission."  Natera's counterclaim fails to state a claim under the CDAFA because it fails to allege that Plaintiff accessed Natera's computer network "without permission."  Neither party points to any caselaw concerning the CDAFA.  Nevertheless, "[c]ourts within this District have interpreted 'without permission' to require that a defendant access a network 'in a manner that circumvents technical or code-based barriers in place to restrict or bar a user's access."  In re Google Android Consumer Privacy Litig., No. 11-md-02264-JSW, 2013 WL 1283236, at * (N.D. Cal. Mar 26, 2013) (citing Facebook, Inc v. Power Ventures, Inc., 844 F.Supp. 2d 1025, 1036 (N.D. Cal. 2012) ("Power Ventures II"); Power Ventures I, 2012 WL 3291750, at *11).

Similarly to its CFAA counterclaim, Natera does not allege that Plaintiff did not have authorized access to Natera's computer network, much less that Plaintiff accessed Natera's network by overcoming its technical or code-based barriers.  Therefore, Natera's counterclaim under the CDAFA is hereby DISMISSED with leave to amend.

**V.    CONCLUSION**

For the foregoing reasons, the Court ORDERS as follows:

18

1. Natera's counterclaim for breach of fiduciary duty is hereby DISMISSED with prejudice.

2. Natera shall amend its counterclaims for fraud in the inducement and breach of the separation and confidentiality agreements consistent with the terms of this Order.

3. Natera's counterclaims for violation of the Computer Fraud and Abuse Act and the California Comprehensive Computer Data Access and Fraud Act are hereby DISMISSED with leave to amend consistent with the terms of this Order.

**4.** Natera shall file any amendment to its counterclaims within thirty days from the date of this Order.

**IT IS SO ORDERED.**

Dated: October 16, 2013

_____
JON S. TIGAR
United States District Judge